Tbe opinion of tbe Court was delivered by
JOHNSTON, Ch.
As no such point has been raised by tbe defendant, we are not disposed to volunteer tbe inquiry wbicb has suggested itself to our minds — whether tbe plaintiffs should not have brought tbeir complaint in tbe form of an information ex relatione, through tbe attorney-general; which would seem to be tbe more fitting proceeding when a corpor ation, acting as a single body, without reference to majority *159 or minority, is sought to be restrained from an abusive exercise of its powers.
"We are satisfied, upon other grounds, that the plaintiffs are not entitled to hold their decree.
The corporation, whose acts are now under examination, did not originate in the statute of 1787,(a) referred to in the decree as its charter. It was created as far back as 1706. By a statute of that year,(b) the county of Berkley — (which, by an order of the Lords Proprietors, given in 1682, embraced Charlestown, and extended on the coast, from Sewee on the north to Stono-creek on the south, and bad for its inland boundaries, Craven county, northward, and Colleton county, southward,) — was divided into six parishes, of which Christ Church was one: and by several sections of tbe same statute, the rights, and privileges of the rectors, select vestries and wardens of the different parishes, with the modes of their appointment, were fixed and regulated. The statute is in its terms perpetual.
It is well known that the Episcopal Church was the established Church in the south part of the province of Carolina, now called South Carolina, from the time of Sir Nathaniel Johnson, during the residue of the proprietary government, and from the beginning of the royal government, after the surrender of their charter by the lords proprietors, up to tbe time of the revolution.
Then we have the constitution of the 26th March, 1776,(c) by the 29th clause of which, it is declared that “all laws now of force here, and not hereby altered, shall so continue, until altered or repealed by the legislature of this colony, unless where they are temporary, in which case they shall expire at the times respectively limited for their duration.”
The constitution of 19th March, 1778,(d) clause 88, while *160 extending toleration to “all persons and religious societies who acknowledge that there is one G-od, and a future state of rewards and punishments, and that God is publicly to be worshipped,” and announcing that “the Christian protestant religion shall be deemed, and is hereby constituted and declared to be the established religion of this State,” and that “all denominations of Christian protestants in this State, shall enjoy equal religious and civil privileges:” proceeds "to accomplish this desirable purpose, without injury to the property of those societies of Christians which are by law already incorporated,” by establishing certain process by which those societies desiring incorporation may obtain it: and expressly declares “that the respective societies of the Church of England that are already formed in this State, for the purpose of religious worship, shall still continue incorporate, and hold the religions property now in their possession.”
Thus stood the Episcopal Church of the parish of Christ Church, when in 1787, the Act (a) was passed which has been regarded as its present charter. (b)
If this statute gave to it certain powers suited to particular circumstances, or powers of a circumscribed nature, it did not take away the general or larger powers it already possessed. In such cases, the new charter is regarded as amendatory of the old, the new is purely cumulative, and the case is as if the old and the new were issued together, forming one charter.
*161 I suppose tbat tbe vestry and wardens of this parish church, independently of the statute of 1787, and acting merely as a corporation under the statute of 1706, according to the polity of a colonial Episcopal Church, had a right to apply any church funds, not devoted to specific objects, to the advancement of general religious purposes in the parish, (a) If their church building were destroyed, or its site become insalubrious or the bulk of the parishioners collected in some other neighborhood, — if any circumstances rendered it advisable, having respect to the whole parish — I suppose it was competent to change the location, and erect a new church edifice elsewhere. And so, I suppose, if for a portion of the year, a majority of the parishioners were collected for their health at Mount Pleasant, it was competent to make provision for a chapel for public worship there, provided the consent of the Eector, and of the Bishop were obtained.
These privileges were not taken away by the statute of 1787. But if we confine ourselves to that statute alone, I am still of opinion, that the proceeding against which the injunction has been granted was within the powers of the corporation.
The statute incorporates them as an Episcopal Church; which, in- my opinion, gives them all the powers belonging to churches of that order; as to which I have already spoken. But, it moreover appears in the statute, that it was passed in answer to their petition to be incorporated “and vested with all the powers privileges and immunities which any of their sister churches enjoy.” They are accordingly in express terms, “ vested with all the powers and authorities which are vested in any corporated and established Church in this State.” By this I understand, not all the powers belonging to churches of a different denomination, but to those of their own ritual. Here, again, we have a general grant of powers, such as belong to the vestry and wardens of Episcopal churches. *162 And it so happens, that in an Act, (a) passed but five days before this, the vestry and wardens of the parish of St. Bartholomew, were incorporated, with express power to restore dilapidated chapels.
I think it is but fair to give statutes incorporating churches a liberal construction, for advancing the cause of religion: and while I would never favor such a construction as would permit any church, or any majority in it, to pervert its tenets,'its organization or its ritual from their true denominational character, I would do every thing in my power, to advance all its acts, (not revolutionary,) tending to wholesome purposes.
It appears that in 1787, this corporation possessed funds which had been contributed for the special purpose of reconstructing their church building, which had been burned down ,by the enemy, during the revolutionary war. If these funds remain, and any portion of them enter into the appropriations complained of in the bill, the appropriation might be restrained. But the burden of showing thip was on the plaintiffs, and it has not been shown. Are we, without proof, to presume that when funds have been raised to build a church, and the church has been built, it has not been accomplished by expending the funds ? Are we to presume any thing of such a character, after a lapse of seventy years?
It is ordered that the circuit decree be set aside, and the bill dismissed.
Dunkin, Dargan AND Wardlaw, CC., concurred.

Decree reversed.

 5 Cooper, 140,

 2 Cooper, 282»

o) 1 Cooper, 12S.

 1 Cooper, 13T.

 8 Cooper, 140.

 And see Constitution of June 3,1790, Article 8, § 2, (1 Cooper’s Statutes, 191), which declares that “the rights, privileges, immunities, and estates of both civil and religious societies, and of bodies corporate, shall remain as if the constitution of this State had not been altered or amended.” In this, and in the previous revolutionary constitutions, the saving of pre-existing laws, would seem to have been unnecessary; for such seems to be the result under every conquest or revolution, except so far as the laws are repugnant to the constitution or structure of government, of the conqueror or revolutionary party. So far as the prior laws are political, they give way; so far as they are purely civil, or municipal, they remain.

 See Vestry & Wardens vs. Barksdale, Strob. Eq. 200, et seq.

 8 Cooper, 137.